**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-CR-00725 (RDM)** |
| **v.** | : | |
| | : | |
| **LUKE FAULKNER,** | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Luke Faulkner to 14 days incarceration, as a condition of a three-year term of probation pursuant to 18 U.S.C. § 3563(b)(10), 60 hours of community service, and $500 in restitution.

**I.       Introduction**

Defendant Luke Faulkner, a fifty-nine year old self-employed concrete contractor, participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 13, 2022, (ECF No. 60 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Faulkner pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days incarceration is appropriate in this case because: (1) Faulkner witnessed rioters breaking glass and engaging in other property damage to the U.S. Capitol building, and he smelled tear gas in the air; (2) nonetheless, he entered the U.S. Capitol building through the Senate Wing Door with a mob of other rioters approximately four minutes after the Senate Wing Door was first breached, making him aware of the potential for violence and further property destruction; and (3) he unlawfully protested in the Crypt while police were trying to stem the tide of invading rioters present at that location. He left the Capitol approximately 15 minutes after he had entered it.

The Court must also consider that Faulkner's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Faulkner's participation in a riot that succeeded in halting the Congressional certification renders a sentence of 14 days incarceration both necessary and appropriate. Furthermore, the aggravating factors above explain why probation only is not warranted in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 60 (Statement of Offense), at ¶¶ 1-7.

*Faulkner's Role in the January 6, 2021 Attack on the Capitol*

On or about January 6, 2021, Faulkner traveled with co-defendant Kenneth Massie ("Massie") from Blanchester, Ohio to Washington, D.C. to attend the "Stop the Steal" rally. After attending the rally with Massie and co-defendant Jared Kastner ("Kastner"), Faulkner walked to the U.S. Capitol.



*Exhibit 1 – Faulkner (red) in Washington, D.C. on January 6*

At approximately 2:00 p.m., rioters forced their way onto the restricted grounds of the U.S. Capitol. *Id.* at 5. Rioters made their way up the west side of the Capitol grounds to the Senate

Wing Door. There, rioters smashed glass windows and kicked at the Senate Wing Door from the outside in an attempt to gain entry to Capitol building. At approximately 2:13 p.m., the Capitol building was first breached by a rioter who jumped through a broken window adjacent to the Senate Wing Door.



*Still from Exhibit 2 – First rioter enters Capitol building*

Less than one minute later, rioters who had entered through the broken windows kicked open the Senate Wing Door from the inside. Many rioters who had amassed outside the Senate Wing Door then entered the Capitol building.



*Still from Exhibit 2 – Rioters kick open the Senate Wing Door*

At 2:17 p.m., approximately four minutes after above-described breach, Faulkner entered the U.S. Capitol building with Kastner through the Senate Wing Door, as alarms sounded. Faulkner and Kastner joined other rioters who were already unlawfully inside the building. As shown in Exhibit 2, Faulkner was wearing his hair in a ponytail, and wore a black face covering, black jacket, blue jeans, and brown boots.



*Still from Exhibit 2 – Kastner (yellow) and Faulkner (red) enter the Capitol building*

Also at this time, as shown in Exhibit 2, rioters were moving throughout the lobby of the Senate Wing Door area. Faulkner and Kastner turned to their right and walked with other rioters past broken furniture and broken glass on the floor from the smashed-in windows. As Faulkner and Kastner traveled towards the House of Representatives side of the Capitol building, they were reunited with Massie, as shown in Exhibit 3. Massie was greeted by Faulkner with a high-five and a pat on the head, and by Kastner with a hug.



*Still from Exhibit 3 – Faulkner (red), Massie (green), and Kastner (yellow) near the Crypt*

Faulkner, Kastner, and Massie then traveled further into the Capitol building to the Crypt, as shown in Exhibit 4.



*Still from Exhibit 4 – Massie (green), Kastner (yellow), and Faulkner (red) in the Crypt*

At approximately 2:22 p.m., Faulkner appears to have his hand on Kastner's shoulder, and Kastner appears to have his hand on Massie's shoulder, while the group moved through the Crypt, as shown in Exhibit 4.



*Still from Exhibit 4 – Massie (green), Kastner (yellow), and Faulkner (red) in the Crypt*

At approximately 2:25 p.m., a group of rioters in the Crypt pushed towards and through a line of police officers who were attempting to hold back the crowd, as shown in Exhibit 5. Faulkner and Kastner are shown in Exhibit 5 in the middle of the crowd.





*Stills from Exhibit 5 – Kastner (yellow) and Faulkner (red) in the Crypt*

After remaining in the Crypt for approximately ten minutes, Faulkner, Kastner, and Massie returned to the Senate Wing Door by the route that they had taken to the Crypt. At approximately 2:32 p.m., Faulkner exited the Capitol building through a broken window adjacent to the Senate Wing Door, as shown in Exhibit 6. Faulkner was inside the Capitol building for approximately 15 minutes.



*Still from Exhibit 6 – Kastner (yellow) and Faulkner (red) exiting the Capitol building*

The government does not have evidence that Faulkner personally engaged in any destructive or violent activity while inside the U.S. Capitol building.

*Faulkner's Interview*

Following his arrest on December 8, 2021, Faulkner agreed to be interviewed by FBI agents. Faulkner advised that he travelled to Washington, D.C. to attend the "Stop the Steal" rally. Faulkner drove his vehicle from Ohio, transporting Massie and one other individual. Once they arrived in Washington, D.C., Faulkner joined a group that included Kastner and Massie, as well as two other individuals who did not enter the Capitol building. The group walked together around

various memorials before attending the rally near the Washington Monument. Faulkner stated that he left the rally before it was over to walk to the U.S. Capitol at the former President's direction. On the way, Faulkner heard protestors saying, "They're storming the Capitol." Faulkner was separated from his group during the walk.

When he arrived at the Capitol grounds, Faulkner observed police officers forming lines and rioters breaking glass on the exterior of the Capitol building. Faulkner told agents that he knew tear gas had been deployed because he smelled it in the air.

Faulkner admitted to entering the U.S. Capitol building with Kastner. Once inside, Faulkner and Kastner located Massie. Faulkner heard other rioters chanting and observed police officers holding a line against rioters who were pushing and shoving. During that time, Faulkner claimed he was fearful for his life and thought he was going to be crushed in the crowd. Faulkner made his way back through the crowd and exited the Capitol building through a broken window. Faulkner estimated that he was inside the Capitol building for 10 to 15 minutes.

Faulkner informed agents that he observed objects being thrown and heard individuals yelling at rioters for engaging in property damage when he returned outside the Capitol building. Faulkner attempted to coordinate a meeting with his group over the phone. Faulkner then returned to his car by Metro and drove back to his residence in Ohio.

In sum, Faulkner accepted responsibility for his actions and admitted that he entered the U.S. Capitol building on January 6, 2021. Following his initial appearance in the Southern District of Ohio and again upon the return of property seized during arrest, Faulkner expressed remorse and regret for his conduct on January 6, 2021, to an FBI agent.

*The Charges and Plea Agreement*

On December 7, 2021, Faulkner and co-defendant Kastner were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 8, 2021, they were arrested in Ohio. Also, on December 8, 2021, Faulkner and Kastner were charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 9, 2022, Faulkner, Kastner, and Massie were charged by four-count Superseding Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).

On October 13, 2022, Faulkner pleaded guilty to Count Four of the Superseding Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. Under the plea agreement, Faulkner agreed to pay $500 in restitution to the Department of the Treasury.[2]

## III.    Statutory Penalties

Faulkner now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, he faces up to six months of imprisonment and a fine of up to $5,000.[3] He must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[2]    On October 21, 2022, Massie pled guilty to a single count of violating 18 U.S.C. § 5104(e)(2)(G).  Massie is scheduled to be sentenced on January 27, 2023, one week after Faulkner is sentenced.  Kastner is awaiting trial, scheduled for August 8, 2023.

[3] Because Faulkner has pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 14 days incarceration, three years' probation, and 60 hours of community service.

### A.     The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Faulkner's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Faulkner, the absence of violent or destructive acts is not a mitigating factor. Had Faulkner engaged in such conduct, he would have faced additional criminal charges.

Faulkner arrived on the grounds of the U.S. Capitol and entered the Capitol building at approximately 2:17 p.m. In order gain entry to the Capitol at that time, he would have crossed over broken down barricades and passed by bike racks, that were intended to prohibit entry into the

restricted area of the Capitol grounds, but which had been pushed aside. Faulkner informed agents that, prior to entering the Capitol building, he observed rioters breaking glass and smelled tear gas in the air. On the West Front of the Capitol at that time, Faulkner would have witnessed individuals on scaffolding and on the media tower and seen individuals confronting police officers. Despite these circumstances, Faulkner joined a crowd that advanced toward the Capitol building and, with the crowd, made entry through a non-public entrance at the Senate Wing Door approximately four minutes after the Capitol was first breached. Thus, he took advantage of the opportunity presented by the mob, ignored the violence taking place, and unlawfully entered the Capitol building.

While inside the Capitol and over the course of approximately 15 minutes, Faulkner explored his surroundings, despite observing rioters breaking glass and hearing alarms blaring throughout the building. Eventually, Faulkner departed along with other rioters who police officers were ordering and/or forcing to exit the building. Under all of these circumstances, Faulkner knew that he was not permitted to be in the Capitol building, but he entered it and remained inside anyway.

Therefore, the nature and circumstances of the offense supports the recommended sentence of 14 days incarceration.

### B.    Faulkner's History and Characteristics

As set forth in the PSR, Faulkner is fifty-nine years old and is a life-long resident of Ohio. PSR ¶ 42. For twenty-three years, he has been a self-employed concrete contractor who owns his own business who occasionally hires laborers for his larger projects. PSR ¶ 51.

Faulkner was convicted in 1997 for domestic violence in an Ohio state court, for which he received a sentence of 180 days incarceration with 179 days suspended, and one year of probation. PSR ¶ 29.

15

Following his arrest for the charges in the instant case, Faulkner has expressed remorse for his criminal conduct and a desire to plead guilty, acknowledge his conduct, and promptly resolve his case. When recommending an appropriate sentence, the government gives significant weight to Faulkner's early acceptance of responsibility.

<strong>C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law</strong>

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

<strong>D.    The Need for the Sentence to Afford Adequate Deterrence</strong>

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

<em>General Deterrence</em>

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

16

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Faulkner's conduct on January 6 demonstrates the need for specific deterrence. Prior to entering the Capitol, he observed rioters breaking glass of the building and smelled tear gas in the air. Faulkner ignored the violence taking place on the grounds of the Capitol between rioters and police officers, and he chose to join the mob that stormed into the Capitol building. Apparently unconcerned once he entered, he ventured further into the Capitol building to the Crypt. Faulkner was no mere tourist, and these were not normal visiting hours or circumstances. He was only able to gain entry to the Capitol building because of the riot and he stayed inside the building for

approximately 15 minutes. Although his actions at the Capitol on January 6 were more limited than many others', his actions contributed to the danger and violence of that day by increasing the size of the crowd inside restricted areas and the Capitol itself.

Unlike some other January 6 defendants, Faulkner has accepted responsibility for his actions and indicated his remorse. Thus, his conduct suggests a lesser need for specific deterrence than in some other cases. A period of 14 days incarceration, 36 months of probation, and 60 hours of community service will adequately serve that purpose.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Faulkner based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Faulkner has pleaded guilty to Count 4 of the Superseding Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

records who have been found guilty of similar conduct," 18 U.S.C.A.   § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The instant case bears some similarity to *United States v. Richard Watrous*, 1:21-CR-00627. There, Chief Judge Howell imposed 14 days of intermittent confinement as a condition of 36 months' probation, two months of home confinement, where the defendant, among other things, took a photo of a damaged window by the

Upper House Door but then still entered the Capitol building and stayed for five minutes, and watched as a man went stole wine reportedly from Speaker of the House Nancy Pelosi's office, and the defendant reentered the Capitol building again later despite seeing those things that should have given him misgivings.

In *United States v. Leticia Ferreira*, 1:22-cr-00210, Judge Chutkan imposed a sentence of 14 days incarceration and 36 months' probation. There, the defendant entered the Capitol building two minutes after it was initially breached, after seeing tear gas deployed into an angry crowd of rioters gathered near the Inaugural stage, and she remained inside for 45 minutes. The defendant went to the Crypt and was part of a group of rioters who forced their way through a line of police officers who were attempting to stop the advance of the crowd through the Capitol building.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    A sentence of probation may include imprisonment as a condition of probation.

First, a sentencing court may impose imprisonment as a condition of probation under 18

U.S.C. § 3563(b)(10). Under Section 3563(b)(10), the Court may impose an imprisonment term in

distinct intervals, with each interval not exceeding two weeks. Second, a sentencing court may

impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v.*

*Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—under 18 U.S.C.

§ 3561(a)(3). *See United States v. Little*, 590 F.Supp.3d 340, 351 (D.D.C. 2022) (explaining that a

sentence of 60 days of imprisonment followed by three years of probation is permissible under

Section 3561(a)(3) for a defendant convicted of a single petty offense).[5]

In this case, a sentence of 14 days of imprisonment and 36 months of probation is sufficient,

but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

The Court may impose such a sentence either under Section 3563(b)(10), with a term of

imprisonment as a condition of probation, or as a split sentence under Section 3561(a)(3).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant remain in the custody of the Bureau of Prisons during nights, weekends, or other

---

[5] Several judges of this District have imposed a split sentence on a defendant convicted of a single petty offense. *See, e.g.*, *United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ([T]he Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF No. 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF No. 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21-cr-686 (FYP), ECF No. 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF No. 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21-cr-607 (EGS), ECF No. 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21-cr-601 (JDB), ECF No. 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21-cr-342 (PLF), ECF No. 74 (D.D.C. August 1, 2022) (same).

intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release. 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[6]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation. 18 U.S.C. § 3653(b)(10). Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation. *Id.* Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation. *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10). Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 14 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[7]

## VI.    A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence 14 days in prison and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3). As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[8]

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

---

[7] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[8] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

sentence. Balancing these factors, the government recommends that this Court sentence Faulkner to 14 days incarceration as a condition of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10), 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY


By:     s/ *Will N. Widman*
        WILL N. WIDMAN
        Trial Attorney, Detailee

## CERTIFICATE OF SERVICE

On this 9th day of January, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:      s/ *Will N. Widman*
                WILL N. WIDMAN
                Trial Attorney, Detailee