## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-725(RDM)** |
| **LUKE FAULKNER** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Luke Faulkner through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the PSR with Mr. Faulkner, there are no objections. For the reasons set forth herein, Mr. Faulkner requests that this Honorable Court impose a sentence of one year of probation, 60 hours of community service and $500 restitution to account for:

1.     His lack of need for incarceration,

2.     His long history of a strong work ethic which has allowed him and his family to be productive members of society;

3.     His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach; and

4.      His peaceful, non-destructive and non-violent behavior that day

both outside and inside the Capitol building.

## I.      **Background**

Mr. Faulkner comes before the Court having plead guilty  to count 4 of the

Information  charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G).

The sentencing guidelines do not apply to this Class B misdemeanor offense. The

government will dismiss the remaining counts at the time of sentencing. There is

no mandatory minimum; the maximum sentence of imprisonment is six months.

Mr. Faulkner signed a detailed statement of offense in which he admitted that he

entered the U.S. Capitol building through a Senate Wing door, traveled through the

Crypt, and exited after about 15 minutes.  He did not cause any damage, nor did he

engage in any acts of violence. He did not enter the Senate Room floor, nor did he

enter any private offices. He completely and truthfully cooperated with law

enforcement when asked to do so. Undersigned counsel can't think of a case with a

less culpable J6 defendant.

## II.      **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle began spreading the word that the election was "stolen" from him by

Democrats and others.  https://www.washingtonpost.com/politics/trump-election-

voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

False claims  by President Trump that the election was rigged were made on media

sources, as well as by the President himself, that the election system had been

corrupted and that the integrity of the election should be questioned. Trump

refused to concede. He showed himself willing to undermine confidence in the

democratic process and in time, managed to convince nearly three-quarters of his

supporters (to include Mr. Faulkner) that the loser was actually the winner.

    As the January 6th committee hearings show, Donald Trump and his

advisers knew that he had in fact lost the election but despite this knowledge they

engaged in a massive effort to spread false and fraudulent information to

convince huge portions of the U.S. population that fraud had stolen the election

from him.  According to Representative Liz Cheney,  Vice Chair of the House

Select Committee investigating January 6, "President Trump invested millions of

dollars of campaign funds purposely spreading false information, running ads he

knew were false, and convincing millions of Americans that the election was

corrupt and that he was the true President." *See*

https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript.

    According to a Washington Post Article from June 13, 2022, many in

Trump's inner circle, including  his White House Counsel, informed Trump that

there was no basis for overturning the election results but that Trump ignored those

voices.  While most of these high profile lawyers and advisers to the President

testified to the January 6th committee that they told the President personally the

facts about the election results and their discomfort with his claims that the election

had been stolen, most did not "correct the public record on the issue or speak out

against Trump's false claims." https://www.washingtonpost.com/national-

security/2022/06/13/jan-6-committee-hearings-live/  When these government

advisors  failed to correct the narrative, it left a huge informational void that was

filled with the likes of conspiracy theorists, online extremists and Trump loyalists

willing to manipulate public opinion for their own purposes.  People like Mr.

Faulkner stood no chance at truly grasping the gravity or reality of the situation, let

alone know what the facts truly were before January 6, 2021.

    This Court can only understand why Mr. Faulkner came all the way from

Ohio to D.C. to attend the Trump Rally by taking into account the enormous

influence the President, the media, and the lack of accurate and truthful

information played in the months leading up to January 6, 2021.  While

consumption of media news is no excuse for ill-informed behavior, it does

demonstrate the powerful impact news stories, fake or real, have on the citizens of

this country, not just Mr. Faulkner.  The media sets the tenor for how people feel

about their rights and freedoms and can also plant notions (often false) of

discontent or even outrage.  After months of watching our major cities burn, many

people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard.  Additionally, because of the widespread belief, which turned out to be true, that very few BLM supporters were being prosecuted for their criminal behavior while violently protesting, the media helped reinforce the notion that there would be little to no consequences for protestor actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/.  The federal courthouse in Portland, Oregon was literally taken hostage by violent rioters and yet almost half of those cases were dropped and other defendants received the equivalent of a slap on the hand for their participation.  Here in D.C., although hundreds, if not thousands, committed property crimes such as painting federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts which received record high audiences in 2020.  *https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.  And the President himself added fuel to the fire by declaring that he was trying to actually

protect the democratic process.[1] In fact, we now know that through the Senate

investigation that Mr. Trump tried to bully government officials to overturn the

election. Before the January 6 attack on the Capitol, Trump White House officials

and members of the right-wing House Freedom Caucus strategized about a plan to

direct thousands of angry marchers to the Capitol Building.[2] This long march from

the "Stop the Steal" rally at the Ellipse to the Capitol was no accident. It was well-

planned in advance, with Mr. Trump and Mr. Giuliani urging the crowd to

violence.

 Mr. Faulkner like millions of other Americans, ate up the online and

televised media coverage of these events in the Summer of 2020.   He saw the so

called "mainstream" media label destructive and violent BLM riots as "mostly

---

[1] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an
election when the numbers being certified are verifiably WRONG. You will see the real numbers
tonight during my speech, but especially on JANUARY 6th…"
https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28,
2022).

[2] *See* the findings of federal judge David O. Carter of the Central District of California, in
*Eastman v. Thompson*, case No. 8:22-cv-00099-DOC-DFM.
The Court found that Mr. Trump and Mr. Eastman likely had committed felonies, including
obstructing the work of Congress and conspiring to defraud the United States. The Court wrote,
"As the courts were overwhelmingly ruling against President Trump's claims of election
misconduct, he and his associates began to plan extra-judicial efforts to overturn the results of
the election and prevent the president-elect from assuming office (footnote omitted). At the
heart of these efforts was an aggressive public misinformation campaign to persuade millions of
Americans that the election had in fact been stolen." (pg.5). The opinion continues, "The
President nevertheless continued to insist falsely through January that he had "won the election
in a landslide." And despite being repeatedly told that his allegations of campaign fraud were
false, the President continued to feature those same false allegations in ads seen by millions of
Americans." (footnote omitted, pg.7).

6

peaceful" and the protestors praised on national media outlets for their strongly held beliefs. And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not. The report suggested that the "disparity stems from political orientation and biased media framing such as disproportionate coverage of violent demonstrations." https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

Mr. Faulkner  similarly had strongly held beliefs after the Presidential election, mostly influenced by the President's own messaging and propaganda, that there had been irregularities in the election.  He decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added).   A video released by the New York Times demonstrates that on January 6, there were two types of protestors there in the crowd that day.  https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan  to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Faulkner were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



The plan depended on creating chaos and whipping up the "normies" into a patriotic frenzy. The groundwork for this frenzy had been laid in the weeks before January 6th by the Trump propaganda about election fraud and had been fueled by Trump himself at the rally on the mall. The Proud Boys intended to use the large crowd to distract and overwhelm as they went to work of breaking into the Capitol.

Mr. Faulkner had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine. Consider that is has taken the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years of investigation, to parse through to what they feel is some truth about what transpired that day. How could Mr. Faulkner, or any "normie" that

day have known what was to happen?   He came to the Capitol with no intent to do anything but add his voice to the vocal protests over the injustice he perceived had happened in the election.   He thought of himself as a witness to this injustice and the historic protest that day.   Yet he did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothing. He did not carry anything such as a flag or sign.  He came with two friends,  not as part of a group. Mr. Faulkner committed no violent actions in his peaceful protest.  He did not destroy anything. His only desire was to participate in a democratic process that is protected under the First amendment of our Constitution. Unfortunately, he now understands that going into the Capitol that day was not part of that legal democratic process, he regrets his actions.  He now stands before the Court after admitting to the Court at his plea hearing that he knew going into the Capitol that day was wrong.

### III.   THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.  Mr. Faulkner's trip to D.C. and his walk to the Capitol

Mr. Faulkner  believed what he read on the internet and heard from the President himself - that the election had been stolen.   He believed that there was wrongdoing in the State of Georgia.  He also believed that he should show his support for the soon to be former President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall.   Importantly, Mr. Faulkner was fixated

10

on the *process,* not the result of the election. The emphasis on the process, and not

the result, is particularly important because it shows that Mr. Faulkner values the

Constitution and the foundation of our government.  At no time did he ever think

he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech

did he have any intention of  going anywhere other than the Ellipse area, and not

being from the area or having attended a protest  before, had no real sense of where

things were in relation to each other.  As the day unfolded, he never planned or

envisioned entering the U.S. Capitol.  That is, *not until Trump invited everyone to*

*march to the Capitol.* Mr. Faulkner and his friends followed the large crowd there

that day with no intention of doing anything but having their voices join those of

thousands of other peaceful protestors. Now, after seeing what really happened that

day by watching film on numerous platforms, Mr. Faulkner regrets going into the

Capitol as he  had no idea that there was to be so much violence that day.

    **B.**  **Mr. Faulkner's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know,

the Proud Boys instigated a push to overwhelm the few, undertrained, under

equipped and unprepared  Capitol police.[3] Officers were able to hold off the

---

[3] *See* Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol,
The New York Times (June 30, 2021), available at
https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html;
see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the

excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This was several minutes before Mr. Faulkner followed his friend  into the Capitol.   This breach spurred the evacuation of members of Congress and the Vice President.

Mr. Faulkner  was not in this first wave  of protesters.   He could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the Capitol. In fact,  Mr. Faulkner had been so far behind the first people in that he had no idea how the door was opened or who opened it. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Faulkner's knowledge and intention* as the day unfolded. That is, though many others were violent, pushing officers, etc., Mr. Faulkner  was not violent, carefully observed the situation around him, and acted with decency (as we will see later).   In fact, once inside the Capitol, Mr. Faulkner spent most of his time in the building looking for a way to get out.  When he tried to leave through the door, it was blocked, Mr. Faulkner saw people going out the window and stopped to help an officer help others through the window. The officer slipped

Capitol, The Washington Post (Jan. 9, 2021), available at
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

and fell, and Mr. Faulkner and others helped the officer up.[4] *See* defense Exhibit 1, video clip at Senate wing door.

### C. Hindsight is 20/20.

Mr. Faulkner never imagined going inside the Capitol and certainly never thought that violence would follow.   He does not condone the violence and did all he could to get himself  out safely, which he did. Indeed, Mr. Faulkner's aimless following of the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to break the law. He respected the police officers he encountered and he proceeded out of the building peacefully when the way out presented itself. He was directed to leave by police officers through a window at the Senate wing doors.

### D. The Charges and the arrest of Mr. Faulkner

On   December 7, 2021,  a sealed complaint was filed against  Mr. Faulkner. *See* ECF No. 1.  He was arrested on December 8, 2021, at the hands of FBI agents conducting a raid as if it were the Cali Cartel.  Long guns, kicking in the door, and screaming after Mr. Faulkner had been arrested. [5] He made his initial appearance

---

[4] The defense has no video that shows this, but expects that like so many other cases, evidence of it may show up months down the road in another case's discovery dump. This seems to transpire with frequency.

[5] Undersigned counsel has seen this pattern and practice in many J6 cases and is appalled that the FBI is allowed to terrorize families in the dark early morning hours for defendants with little or no criminal history. As a formal federal prosecutor, undersigned counsel knows that  these types of raids were reserved for the most dangerous and violent criminals, not trespassers.

before Magistrate Judge Faruqui on December 13, 2021 and was released on a PR

bond.   *See* ECF No. 12.  A criminal information was filed in U.S. District Court

for the District of Columbia charging Mr. Faulkner with four misdemeanor

offenses related to his conduct on January 6. *See* ECF No. 7.[6]   He was arraigned

on December 22, 2021 by this Court.  According to Faulkner,  approximately 14-

15 officers came to his home in the early morning hours.   He was immediately

handcuffed.  They had a search warrant and searched the house while Mr. Faulkner

was being arrested. While the FBI searched his home,  taking lots of pictures, he

willingly spoke to the FBI agents on scene and gave them permission to search his

phone.  Mr. Faulkner  later entered a plea of guilty via video conference before this

Honorable Court on October 13, 2022. *See* ECF Nos. 59 & 60.

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain

factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and

circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence

imposed to: reflect the seriousness of the offense, promote respect for the law, and

---

[6] Those four charges are: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. §
1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2);
(iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv)
Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

provide just punishment; afford adequate deterrence to criminal conduct; protect

the public from further crimes of the defendant; and provide defendant with needed

educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.  The nature and circumstances of the offense and the history and characteristics of the defendant;
2.  The need for the sentence imposed;
3.  The kinds of sentences available;
4.  The kinds of sentence and the sentencing range…;
5.   Any pertinent policy statements issued by the Sentencing Commission;
6.  The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.  The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. <u>Nature & circumstances of the Offense & the History and Characteristics of Mr. Faulkner</u>

First, the defense is not aware of any evidence that defendant's entry into the

Capitol was violent in any way.  Second,  Mr. Faulkner did not engage with others

while parading in the Capitol.  For example, he didn't chant "whose house, our house" or "USA, USA" like literally thousands of other protesters.  Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for a limited period of time-approximately 15 minutes.  The defense is not aware of any evidence that he entered the Senate or House Chamber or any other private office.

The government must concede that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property or commit violent acts. He entered through a door and exited through a window when directed by police to do so. And when he spoke to police officers, it was non-confrontational and respectful.  He did not suit up for combat.  He did not obscure his face (he wore a mask because of Covid).  He was not armed.  He did not yell at anyone. He wore street clothes.  He committed no violent actions during her time inside and outside the Capitol.  He did not destroy anything.

To his credit, Mr. Faulkner immediately spoke to the officers and  FBI freely when he was arrested.  He fully acknowledged  his misconduct by answering

pointed questions by multiple FBI agents, he  expressed true and full contrition.
He was relieved by the opportunity to take responsibility for his actions.  He has
not one time had any violations of his conditions of release.    He did not post
anything on social media or brag to friends. By the time Mr. Faulkner arrived at the
U.S. Capitol after 2:00 p.m., many of the barriers that had been erected along the
perimeter of the building were no longer present. Mr. Faulkner met no resistance in
his walk to and inside the Capitol. At the time,  Mr. Faulkner didn't dream he'd be
charged for going into the Capitol.[7]

   Mr. Faulkner's background, life and employment history are laid out in the PSR
and thus will not be repeated here. What stands out is the strong character of Mr.
Faulkner. *See* Exhibit 3, letters of support.  This has been a tough road for Mr.
Faulkner.  His been untruthfully maligned in the press. He works hard and provides
for his family.  His spends his "free time" doing a door knocking ministry for his
church which he's done for many years.  He has a very limited criminal history,
which sounds worse than it actually is and it's very old-more than 20 years old.[8]  His
personal history is best explained by the many letters his friends and family have
written. He pled guilty at an early stage in the proceedings, the first of three

---

[7] Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021). .
[8] This conviction is based on actions of his ex-wife and like many domestic disputes, in an effort to get out of his toxic marriage, he pled guilty to something he believes he was not guilty of at that time.

defendants, thus saving valuable judicial resources. It is of utmost importance to Mr. Faulkner that this Court understand that he is incredibly remorseful for his actions on January 6, 2021.  None of his actions will be erased from the internet. It's there forever.  He has fully accepted responsibility for his bad judgement in entering the Capitol building.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  Yet Mr. Faulkner has been a model for pretrial release. He has a perfect pretrial release record.

   Mr. Faulkner does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm and intended no harm.   His recent past behavior and his post arrest behavior show that he is capable of being a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of probation considering the 3553 factors.

## B. Need for the Sentence imposed

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

   The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been  punished as noted *supra.*  The public will be adequately deterred by the

sentences meted out against those who perpetrated the violence and mayhem at the

Capitol and the negative publicity and collateral consequences attendant to even a

misdemeanor conviction for those involved. Those who would not be deterred by

these consequences are likely not deterrable. And, a sentence that leaves a person

unable to work when other reasonable alternatives exist would not promote respect

for the law. Indeed, unnecessarily harsh sentences imposed upon those who were

less culpable will not encourage respect for the law or promote just punishment,

but are likely to  be counterproductive, and labeled as political posturing.  A

sentence of  probation does constitute punishment  and  it will deter others as one's

liberty interests are curtailed by travel restrictions, reporting obligations, and

limitations on one's personal freedoms. He has been on pretrial release for nearly a

year  with many restrictions.  The National Institute of Justice, Department of

Justice, issued a summary of the current state of empirical research stating that

"prison sentences are unlikely to deter future crime," and "increasing the severity

of punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice

Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July

2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42

Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public

**from further crimes of the defendant**

Mr. Faulkner's  likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition, and  accepted the first plea offer tendered with no hesitation. His acceptance of responsibility was complete and without reservation.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of

enhancing deterrent effects." *Id.* at 1. Given Mr. Faulkner's  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Mr. Faulkner urges the Court to impose a sentence of probation in  this case in light of his family obligations, his sincere and complete remorse, his non-violent conduct at the Capitol, and his early and consistent acceptance of responsibility, and the lack of a need to further deter him.

### C.  The kinds of sentences available

The sentencing guidelines do not  apply  in this case.  A sentence of additional incarceration would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[9]

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay any significant fine.   Considering the value of their home, the fact that there is an outstanding mortgage, and that they have a minor child that they hope to send to college,

---

[9] This does not include every case, just a sampling.

counsel respectfully disagrees with the probation officer that a fine is warranted.

*See* PSR, paragraph 64.   If the Court is inclined to order a fine, a small amount

such as $500 would be  respectfully requested.

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than probation, community

service, and/or restitution, it would create an unwarranted sentencing disparity

compared to similar cases that have already gone to sentencing in this Court.  The

following cases are a sampling where a class B misdemeanor was charged and pled

to and resulted in no incarceration with facts that often were more egregious than

Mr. Faulkner's:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021)
(sentenced to probation);
\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to
two months probation even though she entered through a broken window and
yelled at police officers);
\*\**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced
to probation);
\*\**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF
Nos. 42 & 44 (sentenced to supervised release with home confinement even though
Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied
media accounts of violence were accurate, minimized the conduct of all of the
rioters, 3) called for a revolution even after the events of January 6, 4) encouraged
the rioters to be proud of their actions, and 5) minimized the impact of that day on
lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-
00238 (TFH). This Court imposed a probationary sentence with a short period of
home confinement for Ms. Bustle and an even shorter period of home confinement
for Mr. Bustle. The government recommended probation in this case.
\*\**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three
months home confinement and two years' probation). According to the
government, who recommended probation with a short term of home confinement*,*

Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify.

Comparatively,  Mr. Faulkner's conduct would not justify a sentence of incarceration and such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.  For example, this Court in *United States v. Colbath,* 21 CR 650 (RMD), sentenced the defendant to 30 days of home detention where he took video in the Capitol, re-entered the Capitol and was on the grounds for two hours. Also in *United States v. Jackson*, this Court sentenced the defendant to 90 days in a halfway house when the defendant took videos and pictures in the Capitol, entered several different parts of the Capitol, lacked remorse, and shouted

"oathbreakers" to police officers.   Other judges in this district have done the
following: In *United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan  ordered
30 days of intermittent confinement as a condition of 24 months' probation.  Mr.
Weisbecker's conduct and treatment towards law enforcement was much more
severe than the instant case. He entered the Speaker's suite of offices, he posted
multiple videos and photos on Facebook and other media cites, and berated federal
border patrol officer at checkpoints multiple times with such foul language that
even as a criminal defense attorney, undersigned counsel had never heard before.

In *United States. v. Baker*, 21 CR 273(TFH), Judge Hogan sentenced the
defendant to 9 days intermittent incarceration "when he chose to remain in the
Capitol despite watching police attempt to expel rioters from the building", ECF
#34, p.2, he live streamed the event and also dictated what was happening in real
time and staying in the building even though police told the crowd to leave the
Rotunda. These are factors more aggravating than that of Mr. Faulkner.

In *United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the
defendant to 36 months' probation. Mr. Carlton was a prison guard, and his
conduct was much more egregious than  Mr. Faulkner's. As the government
pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into
the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the
scaffolding, smelling tear gas, and seeing billows of smoke rise around him and

24

from the Lower West Terrace, where rioters were clashing with law enforcement;

(3) initially lied to law enforcement officials about his activity on January 6, 2021;

(4) admitted he "may have" deleted some texts related to January 6; (5) filmed the

chaos around him rather than choosing to leave; (6) has not expressed since

remorse for his crimes on January 6, and (7) as a corrections officer, Carlton

should have recognized the dangers that he and his fellow rioters' presence at the

Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr.

Faulkner engaged in none of this conduct.

In *United States v. Youngers*, 21 CR 640 (TFH) Judge Hogan again gave a

probationary sentence despite that defendant's conduct as outlined by the

government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol
Building, filmed a confrontation between rioters and police, and entered through
the Senate Wing Door within ten minutes of the initial breach. After filming
himself declaring "this is what a revolution motherfucking looks like," and
collecting a souvenir piece of broken glass, he and codefendant George Tenney
proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened
the door for rioters, instigating the breach of the Capitol from the east side.
Youngers tried to open one of the doors too, encouraged entering rioters, and
swatted at a police officer, but then took some steps to assist the now-outnumbered
police, untangling an officer's radio from a bench and temporarily keeping some
rioters away from that officer. Before leaving the area, Youngers filmed another
video celebrating the breach of the Capitol. Back at a hotel, he filmed a video
denying that there was violence at the Capitol and gave an interview wearing a
full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.

All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Faulkner's conduct and characteristics. His actions fall on the low-end of the spectrum that day and his culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  While Mr. Faulkner accepts responsibility for his actions, he was guided and urged every step of the way by no less of an authority than the former President of the United States and a majority of Republican Senators and Congressman that continued to repeat the 'Big Lie' that the election had been stolen by the Democrats. Mr. Faulkner was a  supporter of the former president.

This Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not.*  (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he tried to get out of the Capitol and away from violence* (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *not far and about 15 minutes*; (7) the defendant's statements in

person or on social media; *none on social media, sparse in person* (8) whether the

defendant cooperated with, or ignored commands from law enforcement officials;

*cooperated at the Capitol and at his home*(9) whether the defendant demonstrated

sincere remorse or contrition; and the defendant's conduct after January 6, 2021.

*Yes, he has demonstrated remorse. See* attached letter from Mr. Faulkner, Defense

Exhibit 2.    While these factors are not exhaustive nor dispositive, they help to

place each defendant on a spectrum as to their fair and just punishment.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Faulkner

respectfully moves this court to impose a sentence of 24 months probation, 60

hours of community service,  and $500 restitution.  This sentence  is "sufficient but

not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a

sentence in the best tradition of federal judicial discretion, that would consider Mr.

Faulkner as an individual and account for his unique failings and positive attributes

that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify,

the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364,

(Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:    _____/s/_____
Kira Anne West

27

DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 11th  day of January, 2022 a copy of same was

delivered to the parties of record, by email  pursuant to the Covid standing order

and the  rules of the Clerk of Court.

_____/S/
                Kira Anne West